UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CURTIS SCHWAB,<br><br>　　Plaintiff and Counterdefendant,<br><br>　　v.<br><br>MISSIONSIDE, LLC,<br><br>　　Defendant and Counterclaimant. | Civil Action No. 20-2376 (JEB) |

## MEMORANDUM OPINION

　　Defendant and Counterclaimant MissionSide, LLC purchased Blue Water Media from Plaintiff and Counterdefendant Curtis Schwab in 2019. After Schwab filed suit to recover a signing bonus he believes he is owed, MissionSide counterclaimed. It asserts claims against Schwab for breach of contract, indemnification, intentional or fraudulent misrepresentation and inducement, negligent misrepresentation, and "declaratory relief." It alleges that, during the due-diligence process preceding the sale, Schwab misrepresented Blue Water's financial position, made misleading projections about its future performance, and failed to disclose a half-million-dollar debt.

　　Schwab now moves to dismiss, arguing that three of the counts should be referred to arbitration under the terms of the Membership Interest Purchase Agreement and the remaining two fail to state a claim for relief. The Court will deny the Motion in part and grant it in part, referring the breach-of-contract count to arbitration, staying the indemnification count pending the prior count's resolution, dismissing the declaratory-relief count, and allowing the misrepresentation counts to proceed.

1

I.   **Background**

   A.   Factual Background

Considering the facts set forth in the Counterclaim as true at this stage, the Court begins with the purchase by Defendant and Counterclaimant MissionSide of "all the outstanding member interests in Blue Water Media, LLC." See ECF No. 24 (First Amended Counterclaim), ¶ 1. Blue Water, a "website development services company in the public and private sectors," was founded and wholly owned by Schwab. Id.; ECF No. 24-1 (Membership Interest Purchase Agreement) at 1. In July 2019, MissionSide and Schwab signed the Membership Interest Purchase Agreement, which memorialized the terms of the sale. See Am. Countercl., ¶ 44.

The MIPA was the culmination of an acquisition process that began in July 2018. Id., ¶ 15. According to the Amended Counterclaim, Schwab repeatedly made misleading statements to MissionSide during this process. Id., ¶¶ 23–25. He also allegedly renegotiated contracts at a negative margin with no explanation, directed his then-CFO to invoice customers for work that had not yet been performed, and otherwise acted to inflate the accounts receivable and make Blue Water's revenues appear higher than they actually were. Id., ¶¶ 29–35.

On July 24, 2019, with Schwab's allegedly fraudulent activities still unknown to MissionSide, the parties executed the MIPA. Id., ¶ 44. Most relevant to this dispute, Section 2.04 provides for adjustments to the purchase price at and after closing to account for differences between the target and actual working capital, outstanding debts, and unpaid transaction expenses at the time of exchange. Id., ¶¶ 49–54. It also articulates a process for making these adjustments, which requires the buyer to present the seller with its calculation of the adjustment (Post-Closing Adjustment) and gives the seller a set time period in which to issue its response

(Statement of Objections). See MIPA § 2.04(c). In the event of a dispute over the amount owed, Section 2.04(c)(iii) also outlines a resolution process, whereby:

> [A]ny amounts remaining in dispute ("**Disputed Amounts**" and any amounts not so disputed, the "**Undisputed Amounts**") shall be submitted for resolution to the office of Aronson, LLC (the "**Independent Accountant**") who, acting as experts and not arbitrators, shall resolve the Disputed Amounts only and make any adjustments to the Post-Closing Adjustment, as the case may be, and the Closing Statement.

Aronson's "resolution of the Disputed Amounts and their adjustments to the Closing Statement and/or the Post-Closing Adjustment shall be conclusive and binding upon the parties hereto." Id. § 2.04(c)(v). The MIPA further obligates both parties to indemnify the other against losses arising out of, among other things, inaccuracies or breaches in representations or breaches of obligations under the agreement. Id. § 8.02–8.03.

In keeping with the procedure laid out in Section 2.04, MissionSide provided Schwab with a Closing Statement on October 23, 2019, informing him that he owed a Closing-Price Adjustment of $361,614.72. See Am. Countercl., ¶ 59. In late November, Schwab provided a Statement of Objections to the Closing Statement. Id., ¶ 64. As of the filing of this lawsuit, Schwab has not paid any amount and instead contends that he is owed $100,000. See Am. Countercl., ¶ 68.

In the midst of this post-closing adjustment process, MissionSide also learned that Schwab allegedly owed over $500,000 to the landlord of a property leased by Blue Water. Id., ¶¶ 71–76. MissionSide alleges this is an "indebtedness" and/or a "current liability" of Blue Water that should have been disclosed by Schwab during the negotiations. Id., ¶¶ 77–78. The resulting dispute with the landlord has caused MissionSide to incur "significant expense in negotiating with the landlord," and MissionSide also faces a threat of litigation. Id., ¶¶ 76, 79. Schwab has refused to submit this rent liability to the independent accountant pursuant to

3

§ 2.04(c)(iii), even though MissionSide alleges that it "significantly impacts the Post-Closing Adjustment amount." Id., ¶ 80.

B. Procedural History

Schwab initiated this lawsuit in August 2020 to recover a $100,000 signing bonus he alleges he is owed under an employment agreement with MissionSide. See ECF No. 1 (Compl.), ¶ 12. MissionSide counterclaimed in response, filing the operative First Amended Counterclaim in August 2021. There, it brings counts against Schwab for 1) breach of contract, 2) indemnification, 3) intentional and/or fraudulent misrepresentation and inducement, 4) negligent misrepresentation, and 5) declaratory relief. Schwab now moves to dismiss all five counts. See ECF No. 25-1 (Pl. Motion to Dismiss).

II. **Legal Standard**

Counterdefendant's Motion invokes the legal standards for dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Schwab acknowledges, however, that his arbitration arguments, though presented in a 12(b)(1) motion, may be more appropriately governed by the standard that applies to summary judgment. Id. at 10. The Court agrees. While unusual, courts "have allowed [parties] to 'petition' the court [to direct arbitration under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*,] through the use of a motion to dismiss for lack of subject matter jurisdiction." Brown v. Dorsey & Whitney, LLP, 267 F. Supp. 2d 61, 66 (D.D.C. 2003). When such a motion is opposed on the ground that no agreement to arbitrate was formed, "the proper approach to employ in reviewing the [party's] motion to dismiss and compel arbitration is to apply the same standard of review that governs Rule 56 motions." Id.; see also Stromberg Sheet Metal Works, Inc. v. Washington Gas Energy Systems, Inc., 448 F. Supp. 2d 64, 68 (D.D.C. 2006). That standard instructs the Court to "grant a party's motion to compel arbitration when

4

the pleadings and the evidence demonstrate that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Booker v. Robert Half International, Inc., 315 F. Supp. 2d 94, 99 (D.D.C. 2004) (quoting Fed. R. Civ. P. 56(c)).  The party moving for arbitration "bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact," and "the non-movant's statements should be accepted as true and all inferences should be drawn in the non-movant's favor." Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), and Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

To survive a motion to dismiss under Rule 12(b)(6), which governs the other claims, a complaint must "state a claim upon which relief can be granted." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 552 (2007).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, id. at 555, "a complaint must contain sufficient factual matter, [if] accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  Though a party may survive a Rule 12(b)(6) motion even if "'recovery is very remote and unlikely,'" the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555–56 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

In evaluating a motion to dismiss, a court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation omitted) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)).  The court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint. Trudeau v. FTC, 456 F.3d 178,

5

193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

**III.   Analysis**

Counterdefendant mounts his challenges in two groups: 1) to Counts 1, 2, and 5, which he primarily contends must be sent to arbitration, and 2) to Counts 3 and 4, which he maintains should be dismissed for failing to state a claim.  The Court adopts the same structure here.

A.  Counts 1, 2, and 5

According to Schwab, the Court lacks jurisdiction over Counts 1 (breach of contract), 2 (indemnification), and 5 (declaratory relief) because Section 2.04 of the MIPA is an "arbitration" provision — its omission of that term notwithstanding — that mandates resolution of the issues contained in these claims by an independent accountant.  See MTD at 11–13.  He thus asks the Court to refer these three claims to the parties' designated independent accountant and to stay the entire action during their resolution.  Id.  As the issues differ by count, the Court considers each separately.

1.   *Count 5: Declaratory Relief*

The Court quickly disposes of Count 5, which is styled as a claim for "Declaratory Relief."  See Am. Countercl. at 21.  Declaratory judgment "is a form of relief, not a stand-alone cause of action."  Freyberg v. DCO 2400 14th Street, LLC, No. 20-3156, 2021 WL 1317545, at *2 (D.D.C. Apr. 8, 2021); see also Ali v. Rumsfeld, 649 F.3d 762, 778 (D.C. Cir. 2011).  "To the extent [Counterclaimant] seeks to assert a cause of action for 'declaratory judgment,' then, it is dismissed."  Mohamed v. Select Portfolio Servicing, Inc., 215 F. Supp. 3d 85, 97 (D.D.C. 2016).  MissionSide may, however, pursue declaratory judgment as a form of relief on its other causes of action.  Id.

2. *Count 1: Breach of Contract*

The Court next considers whether Count 1 is properly justiciable. Counterdefendant contends that the Court lacks jurisdiction because MIPA § 2.04(c) is an arbitration agreement that requires this dispute to be submitted to the parties' independent accountant. See MTD at 11–13. Although styled as a Motion to Dismiss for lack of jurisdiction, Schwab's Motion is essentially a petition to compel arbitration under the FAA, and the Court will treat it as such. See MTD at 9–10, 9 n.4 (recognizing FAA standards may govern and invoking FAA in the alternative); see Brown, 267 F. Supp. 2d at 66–69 (treating pleading entitled "motion to dismiss" as motion to compel arbitration under FAA where that was relief sought).

Presented with such a Motion, the Court must first determine whether the parties formed an agreement to arbitrate. See Kindig v. Whole Foods Market Group, Inc., 811 F. Supp. 2d 410, 414–15 (D.D.C. 2011). The relevant language in Section 2.04(c)(iii) provides that, in determining the post-closing adjustment:

> [A]ny amounts remaining in dispute ("**Disputed Amounts**" and any amounts not so disputed, the "**Undisputed Amounts**") shall be submitted for resolution to the office of Aronson, LLC (the "**Independent Accountant**") who, acting as experts and not arbitrators, shall resolve the Disputed Amounts only and make any adjustments to the Post-Closing Adjustment, as the case may be, and the Closing Statement.

Schwab maintains that this language establishes an agreement to arbitrate because, though it does not use that term, it commits the parties to resolve any disputes before a neutral third party. See MTD at 11–12. MissionSide rejoins that this provision merely designates the accounting firm that will "act[] as experts" to calculate a number to be used by the parties when resolving any disputes in court. See Opp. at 8–10.

"When deciding whether parties have agreed to arbitrate a dispute, courts apply 'ordinary state-law principles that govern the formation of contracts.'" Slaughter v. National Railroad

7

Passenger Corporation, 460 F. Supp. 3d 1, 6 (D.D.C. 2020) (quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995)).  Federal law may also inform the definition of what constitutes an agreement to arbitrate under the FAA, though the D.C. Circuit has not determined its relevance.  See, e.g., Fit Tech, Inc. v. Bally Total Fitness Holding Corp., 374 F.3d 1, 6 (1st Cir. 2004).  The Court need not linger on the question of which body of law applies, however, because D.C. law interpreting the D.C. Arbitration Act looks to federal law when defining "arbitration."  See Washington Automotive Co. v. 1828 L Street Associates, 906 A.2d 869, 875 (D.C. 2006).

Under either body of law, "the failure of a contract to describe the relevant dispute-resolution process as 'arbitration' is 'of no legal significance.'"  Id. at 876 (quoting Meshel v. Ohev Sholom Talmud Torah, 869 A.2d 343, 361 (D.C. 2005)); see also McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co., 858 F.2d 825, 830 (2d Cir. 1988) ("It is, in our estimation, irrelevant that the contract language in question does not employ the word 'arbitration' as such.").  What matters instead is whether the language of the contract indicates that "the parties clearly intended to submit some disputes to their chosen instrument for the definitive settlement of certain grievances under the Agreement."  McDonnell Douglas, 858 F.2d at 830 (cleaned up); see also Washington Auto., 906 A.2d at 877 (collecting cases under federal and state law finding enforceable arbitration agreements based on language's indication of parties' intent where "arbitration" was not used); Bank of America, N.A. v. District of Columbia, 80 A.3d 650, 673 (D.C. 2013) ("[C]entral to any conception of classic arbitration is that the disputants empowered a third party to render a decision settling their dispute . . . [and] that the third party's decision will settle the dispute.") (internal quotation marks and citations omitted).  Some courts have also looked to "how closely the specific procedure resembles classic

8

arbitration and whether treating the procedure as arbitration serves the intuited purposes of Congress." Fit Tech, 374 F.3d at 7 (noting with approval decisions of other courts applying this test and declining to find agreements to be "arbitration" when alternative procedures were non-binding).

Applying this methodology to the provision at issue in this case, the Court finds that Section 2.04(c)(iii) is indeed an agreement to arbitrate. That provision clearly manifests an intent to resolve certain disputes — namely, "any amounts remaining in dispute" "with respect to all of the matters set forth in the Statement of Objections" — through a procedure other than the judicial system — that is, "submi[ssion] for resolution to the office of Aronson, LLC." The MIPA, furthermore, provides that Aronson's resolutions and adjustments "shall be conclusive and binding upon the parties." Id. § 2.04(c)(v). Section 2.04 thus precisely describes a "dispute-resolution process in which the disputing parties choose one or more neutral third parties to make a final and binding decision resolving the dispute." Arbitration, Black's Law Dictionary (11th ed. 2019). The Court's conclusion, moreover, is in keeping with decisions assessing similar language in both federal and state courts. See, e.g., Omni Tech Corp. v. MPC Solutions Sales, LLC, 432 F.3d 797, 798, 800 (7th Cir. 2005) (finding agreement required referral to third party where contract provided that disagreements would be referred to accounting firm that, "acting as experts and not as arbitrators," would make determination that would be "final, conclusive and binding"); New River Management Co., LLC v. Henry Schein Inc., 9 Fed. Appx. 232, 234–35 (4th Cir. 2001) (affirming district court's conclusion that clause providing that "independent accounting firm . . . [will] resolve any remaining objections" constituted enforceable arbitration agreement); Washington Auto., 906 A.2d at 875–78 (concluding that written agreement to settle

land dispute via appraisal process was enforceable arbitration agreement under D.C. law, informed by federal law).

Other language in the MIPA does not undermine this conclusion. Although the contract states that the accountants will act "as experts and not arbitrators," MIPA § 2.04(c)(iii), this, as the Fourth Circuit has clarified, merely "means that [they] will resolve the dispute as accountants do — by examining the corporate books and applying normal accounting principles plus any special definitions the parties have adopted — rather than by entertaining arguments from lawyers and listening to testimony." Omni Tech, 432 F.3d at 799. Nor is the conclusion called into doubt by the MIPA's forum-selection clause, which could well govern disputes unrelated to the purchase-price adjustment and, in any event, is couched in permissive rather than mandatory language. See MIPA § 10.10(b) ("Any legal suit, action[,] or proceeding arising out of or based upon this agreement . . . may be instituted in the state or federal courts sitting in the District of Columbia . . . .") (emphasis added).

Since the parties have formed an agreement to arbitrate, the Court next asks whether the count at issue falls within its scope. See Kindig, 811 F. Supp. 2d at 414–15. Like the prior question, this one turns on the parties' intent, and the Court "look[s] to the plain meaning of the actual language" to discern that. Meshel, 869 A.2d at 362. The relevant language defines the scope of matters referred to the independent accountant as "any amounts remaining in dispute ('**Disputed Amounts**' and any amounts not so disputed, the '**Undisputed Amounts**')" relating to "matters set forth in the Statement of Objections." MIPA § 2.04(c)(iii).

The allegations in Count I fall within this, as they involve breaches of contract that affected (or would have affected) the calculation of the post-closing adjustment that was the subject of dispute in the Statement of Objections. Schwab explicitly disputed the Post-Closing

Adjustment amount MissionSide alleges he did not pay. See ECF No. 25-4 (Statement of Objections) at 2–3. The alleged rent liability, in contrast, was not referenced in any of the post-closing documents, but that resulted from MissionSide's lack of awareness about the liability at the time it submitted its documents. If MissionSide's version of events is credited, that liability constitutes an indebtedness of the company that should have factored into the post-closing adjustments and would presumably have been disputed in the Statement of Objections. See Am. Countercl., ¶¶ 71, 77–80; MIPA, Article I (defining "indebtedness); id., §§ 2.03(a)(ii)(A), 2.03(b)(vi), 2.04(a)(i)(B), 2.04(a)(ii), 2.04(b)(i). The parties do not contend otherwise. See MTD at 11–14; Opp. at 8–16. Count 1 is thus appropriately referred to the independent accountants pursuant to MIPA Section 2.04(c)(iii).

      Before moving on, the Court briefly addresses Schwab's contention that the portions of Count 1 based on the allegedly unpaid rent should be dismissed under Rule 12(b)(6). This argument gains no purchase. Contrary to Schwab's assertion, MissionSide has sufficiently alleged that he violated the MIPA by failing to disclose the outstanding rent obligation because Schwab represented that the company's books were "complete and correct" and that no document provided pursuant to the MIPA "contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statement contained therein . . . not misleading." MIPA §§ 3.22; 3.24. MissionSide has also established standing, as it has alleged an injury traceable to Schwab's conduct: expenses already incurred from negotiating with the landlord, along with an unforeseen half-million-dollar rent bill and a threat of litigation to collect that bill. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); cf. Ord v. District of Columbia, 587 F.3d 1136, 1140–41 (D.C. Cir. 2009) (credible and imminent threat of prosecution sufficient to confer standing to challenge statute pre-enforcement). That MissionSide has not yet

11

begun payments to the landlord does not render this breach-of-contract claim unripe for adjudication since the claim "speak[s] of damages that have already been suffered and are being suffered." Casanova v. Marathon Corp., 256 F.R.D. 11, 15 (D.D.C. 2009).

      3. *Count 2: Indemnification*

Unlike Count 1, Count 2 does not fall within the scope of MIPA Section 2.04(c)(iii). As discussed above, that portion of the agreement refers to the independent accountant disputes over the post-closing adjustment of the purchase price. See MIPA § 2.04(c)(iii). Count 2, conversely, involves claims for indemnification under Section 8.02 of the MIPA. See Am. Countercl., ¶¶ 93–99. Specifically, MissionSide seeks indemnification for Schwab's failure to pay the post-closing adjustment, the back rent allegedly owed to the landlord, attorney fees and costs incurred while dealing with the landlord, and all other items constituting "[l]osses" under the MIPA. Id., ¶ 99. Potential indemnification is not among those matters meant to be discussed in the purchase-price-adjustment documents and is thus excluded from the matters that must be referred to the independent accountant. That the amount Counterclaimant seeks in Count 2 mirrors the amount by which it contends the purchase price should be adjusted does not compel a different conclusion.

It does, however, convince the Court that Count 2 should be stayed pending the independent accountant's resolution of the dispute in Count 1. A federal district court has "broad discretion to stay proceedings as an incident to its power to control its own docket." Clinton v. Jones, 520 U.S. 681, 706 (1997) (citing Landis v. North American Co., 299 U.S. 248, 254 (1936)). It "may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it [— or part thereof —] pending resolution of independent proceedings which bear upon the case." Hisler v. Gallaudet University, 344 F. Supp.

2d 29, 35 (D.D.C. 2004) (quoting Leyva v. Certified Grocers of California, Ltd., 593 F.2d 857, 863–64 (9th Cir. 1979)).  The Court so finds here.  Because the extent of any losses for which Counterdefendant is obligated to indemnify Counterclaimant will largely be determined by any post-closing adjustment that the accountant calculates is owed, delaying consideration of the indemnification claim is the most efficient and fairest course for the parties.  If, at that point, MissionSide still alleges that it has incurred losses that it believes Schwab is obligated to indemnify, the Court can consider those arguments.  At that time, it may also revisit any remaining questions about whether this count is ripe for adjudication, which it need not confront now.  The claim is otherwise properly alleged for the reasoning discussed in relation to Count 1.  Count 2 is therefore stayed pending the resolution of Count 1.

    B.  Counts 3 and 4

Schwab also moves to dismiss Counts 3 and 4 under Rule 12(b)(6) for failure to state a claim.  The Court preliminarily notes that it declines to stay these counts pending arbitration on Count 1, unless the parties so desire, as it believes that Counts 3 and 4 are sufficiently independent to be permitted to move forward.  See Kindig, 811 F. Supp. 2d at 416 ("The mandatory stay imposed by the FAA applies only to arbitrable claims and this Court has the discretion to either stay the proceedings or move forward with the remainder of the case pending resolution of arbitration.").

        1.  *Count 3: Intentional and/or Fraudulent Misrepresentation and Inducement*

Under D.C. law, a party alleging fraud must prove that "(1) the defendant made a false representation; (2) in reference to material fact; (3) with knowledge of its falsity; (4) with the intent to deceive the plaintiff; (5) the plaintiff acted in reasonable reliance on that representation; (6) which consequently resulted in provable damages."  Himmelstein v. Comcast of the Dist.,

LLC, 908 F. Supp. 2d 49, 59 (D.D.C. 2012) (quoting Essroc Cement Corp. v. CTI/D.C., Inc., 740 F. Supp. 2d 131, 145 (D.D.C. 2010)). Rule 9(b) requires that, in alleging these elements, "a party must state with particularity the circumstances constituting fraud." Schwab asserts that MissionSide has not alleged sufficient detail of the events constituting fraud to satisfy Rule 9(b) or established that it acted in reasonable reliance on the alleged misrepresentations. See MTD at 15–18. MissionSide, in response, points to the numerous instances of fraud alleged in its Amended Counterclaim and argues that neither its sophistication nor the inclusion of other conditional terms in the MIPA renders its reliance unreasonable. See Opp. at 16–23.

Under Rule 9(b), a "pleader must state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." Kowal v. MCI Communications Corp., 16 F.3d 1271, 1278 (D.C. Cir. 1994) (quoting United States ex rel. Joseph v. Cannon, 642 F.2d 1373, 1385 (D.C. Cir. 1981)). Counterclaimant has met its burden. In its Amended Counterclaim, it alleges numerous, specific instances of Schwab's misrepresenting Blue Water's revenues, presenting financial projections based on contracts he knew would not come through, and failing to disclose known liabilities. See Opp. at 17–19 (citing Am. Countercl., ¶¶ 23, 24, 26–29, 31–37, 39, 42–43, 77–78). MissionSide provides timeframes, identifies Schwab as the key actor, and alleges that it "would not have closed the transaction" or "agreed to the Purchase Price" if not for his fraudulent representations. See Am. Countercl., ¶¶ 106–09. That satisfies Rule 9(b)'s requirement to plead who (Schwab), what (omissions and misrepresentations of basis for future revenues and liabilities), when (2019), and how (through various communications and omissions) it was fraudulently induced to purchase Blue Water. See United States ex rel. Heath v. AT & T, Inc., 791 F.3d 112, 124 (D.C. Cir. 2015). Counterclaimant, therefore, has provided "sufficient

14

substance to the allegations to both afford the [counter]defendant the opportunity to prepare a response and to warrant further judicial process." Id. (citing U.S. ex rel. Williams v. Martin-Baker Aircraft Co., Ltd., 389 F.3d 1251, 1256 (D.C. Cir. 2004)).

Schwab next contends that MissionSide has failed to plead reasonable reliance. He first argues that the MIPA's integration clause — which provides that the MIPA is the sole and entire agreement of the parties, see MIPA § 10.06 — precludes any claim of reasonable reliance based on something not included in the agreement. See MTD at 17–18. Courts in this district have held that "the mere presence of an integration clause does not automatically preclude claims premised on representations or omissions that fall outside the contract." Jacobson v. Hofgard, 168 F. Supp. 3d 187, 202 (D.D.C. 2016); see also id. at 202–04 (recounting evolution of D.C. Circuit and D.C. Court of Appeals' caselaw on this question). Both the D.C. Circuit and the D.C. Court of Appeals have held that certain representations may support claims of fraud even where an integration clause was present — namely, those that are not "representations that a party will or will not do something in the future" but rather those that "conceal fraudulent conduct." Drake v. McNair, 993 A.2d 607, 624 (D.C. 2010); see also Whelan v. Abell, 48 F.3d 1247, 1258 (D.C. Cir. 1995) (drawing this distinction in explaining conclusion in One-O-One Enterprises, Inc. v. Caruso, 848 F.2d 1283 (D.C. Cir. 1988)).

The representations on which MissionSide bases its fraud claim fall into the latter category. It alleges that Schwab misrepresented information about Blue Water's performance, based his projections of future revenues on contracts he knew would not go through, and failed to disclose information he was obligated to share. See Am. Countercl., ¶¶ 23, 24, 26–29, 31–37, 39, 42–43, 77–78. These are not promises of future action, but rather past failures to accurately represent the state of the company for sale. See One-O-One Enterprises, 848 F.2d at 1286

(finding integration clause barred oral promises to retain controlling interest in company and expand business from supporting fraud-in-the-inducement claim but allowed alleged failure to disclose negotiations to support same). The MIPA's integration clause, therefore, does not prevent Schwab's alleged misrepresentations from serving as the basis of MissionSide's fraud claim.

Schwab also presses that MissionSide's reliance on his alleged misrepresentations was not reasonable. His primary argument is that MissionSide, as a sophisticated party with access to Blue Water's financials, knew how to — and indeed did — protect itself from the risk of future poor performance, and so cannot now claim that it reasonably relied on misleading projections of profits or on statements about existing contracts. See MTD at 17–18. Counterdefendant is correct that MissionSide could not reasonably have taken all of his representations at face value with no further inquiry. See In re Estate of McKenney, 953 A.2d 336, 343 (D.C. 2008). But MissionSide did no such thing, and "[t]he reasonableness of a person's reliance on an asserted false statement is a fact-intensive inquiry that is evaluated 'on a case-by-case basis based on all the surrounding circumstances.'" Sibley v. St. Albans School, 134 A.3d 789, 811 (D.C. 2016) (quoting AES Corp. v. Dow Chemical Co., 325 F.3d 174, 179 (3d Cir. 2003)).

Here, the circumstances support the conclusion that MissionSide's reliance on the allegedly fraudulent representations it identifies was not unreasonable. Although "[o]pinions or predictions of future events" do not always support reasonable reliance, a party may rely on such statements "as implicit representations that the [seller] had some factual basis for its stated opinions," especially when the matter involves the seller's "own business or property as to which [it] is bound and must be presumed to know the truth." Boomer Development, LLC v. National Association of Home Builders, 258 F. Supp. 3d 1, 13, 15 (D.D.C. 2017) (internal quotation

marks and citations omitted). Counterclaimant, furthermore, does not base its fraud claim on only the projections of further revenue; rather, it points to the alleged overstatement of cash and contracts, the direction of false invoices, and the failure to disclose alleged liabilities as well. See Opp. at 20–22. These representations were not obviously false; indeed, Schwab signed an agreement indicating that the representations he had put forth were true and complete, and that he had not entered into or amended contracts after a date that preceded the formation of the contracts that formed the basis of the 2019 projections and the renegotiation of other contracts at a negative margin. See MIPA §§ 3.05; 3.07. MissionSide's reliance on these representations was thus not unreasonable as a matter of law.

Counterdefendant's Motion to Dismiss Count 3 for failure to state a claim is, accordingly, denied.

2. *Count 4: Negligent Misrepresentation*

Schwab last moves to dismiss Count 4 on the same grounds as Count 3, as well as for failing to plead a "confidential relationship" between the parties. See MTD at 18–19. As the Court's just-completed discussion on Count 3 applies equally here, it considers only Counterdefendant's additional argument.

Schwab stumbles out of the gate here, as he mischaracterizes MissionSide's final count. He maintains that Counterclaimant neglected to plead an essential element of constructive fraud. That may well be true, but MissionSide has brought a claim of negligent misrepresentation. See Am. Countercl. at 19. Under D.C. law, negligent misrepresentation and constructive fraud are distinct torts with different elements, and a confidential relationship between the parties is not an element of the former. See Boomer, 258 F. Supp. 3d at 20 (elements of negligent misrepresentation); Himmelstein, 908 F. Supp. 2d at 59 (elements of constructive fraud).

To the extent that Schwab argues that MissionSide's counterclaim has not established the requisite duty that is an element of a negligent-misrepresentation claim, see ECF No. 27 (Repl.) at 16–17, the Court need not consider this position since Counterdefendant raised it only in his Reply. See Armenian Assembly of America, Inc. v. Cafesjian, 924 F. Supp. 2d 183, 191 (D.D.C. 2013) ("The Plaintiffs forfeited this argument by failing to raise it in their initial motion."); see also American Wildlands v. Kempthorne, 530 F.3d 991, 1001 (D.C. Cir. 2008).

## IV.   Conclusion

For the foregoing reasons, Counterdefendant's Motion to Dismiss the First Amended Counterclaim will be granted in part and denied in part. Count 5 will be dismissed; Count 1 will be stayed and referred to the independent accountant; Count 2 will be stayed pending the completion of that referral; and Counts 3 and 4 may proceed. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  November 4, 2021